Madden, Judge,
concurring in part and dissenting in part:
I agree with the opinion of the court that the word “overtime,” as used in the applicable statute, means, contrary to its ordinary meaning, work done outside the hours mentioned in the statute, and on Sundays and holidays, even though some or all of the time so designated as “overtime” falls within the regular daily or weekly working period of the employee who claims extra pay for the “overtime.” It follows that so much of the work as is really covered by the statute must be paid for at the statutory rate. I agree also that the ■Government’s failure to collect the' amount of its extra expense from the railroads and ferry companies is no answer to the demand of plaintiffs that they be paid the' statutory compensation. I disagree, however, with the application of the statute relating to extra compensation to the customs employees at the Ambassador Bridge and the Detroit and Canada Tunnel, and think that the judgments should be reduced to whatever extent they include extra compensation for such services.
The language of the statute, Section 5 of the act of February 13, 1911 (36 Stat. 901), as amended by the act of February 7, 1920 (41 Stat. 402; 19 U. S. C. 267), which is made a part of the Tariff Act of 1930 by reference, shows that *176 the extra compensation to be paid to customs’ employees was to be collectible from those who used the extra service. The statute says: “The said extra compensation shall be paid by the master, owner, agent, or consignee of such vessel or other conveyance whenever such special license or permit for immediate lading or unlading or for lading or unlading at night or on Sundays or holidays shall be granted to the collector of customs, who shall pay the same to the several customs officers and employees * ‡
The legislative history of the statute is to the same effect. At the hearings before the Committee on Ways and Means on H. R. 9525 (61st Congress, 2nd Sess.), the companion bill of S. 6011, which became the act of February 13, 1911, several colloquies occurred, in each of which assurance was given that the statute was to be administered without cost to the Government. See pages 462, 463, 464, 470 of the hearings. The Report of the Committee on Ways and Means on S. 6011 recommended passage with the following amendment : “the said extra compensation to be paid by the master, owner, agent, or consignee of such vessels.” The amendment was adopted.
Plaintiffs do not urge that the 1920 amendment of the act of 1911 changed the meaning of the act in this respect. They urge rather that all of the extra compensation for which they sue has been collectible from the users of the service, and that the Government has, by its own negligence, failed to collect the extra compensation from the users of the service, though it has had the legal right to collect it. In effect, then, we are asked by plaintiffs to decide not only that customs employees who rendered the services which they rendered, are entitled to collect extra compensation from the Government at the rate fixed in Section 5, but that the users of such services should have, in the past, and should in the future, apply for and take out a special license or permit pursuant to Section 451 of the Tariff Act of 1930 (46 Stat. 708, 715; 19 U. S. C. 1451), giving bond to indemnify the United States for any loss or liability which might result from the special license or permit, and to pay the extra compensation to the employees.
*177 Among the services sued for by plaintiffs were those at the Ambassador Bridge, which spanned the Detroit River, connecting Detroit and Sandwich, Ontario. We have found that over this bridge “Traffic was continuous for twenty-four hours per day and included foot passengers, vehicular traffic, commercial trucks and busses.” In my opinion, the statutes do not require the Government to impose upon a pedestrian who walks across the bridge between five o’clock in the afternoon and eight o’clock in the morning, the duty of applying for a permit and giving a bond to pay the extra compensation of customs employees. The pedestrian might well point to the statute, which speaks of a “vessel or vehicle” (Tariff Act of 1930, Section 451, 46 Stat. 708, 715), and urge that even the broad definition of vehicle which appears in Section 401 of that act does not include his means of locomotion. Private automobiles also cross the bridge. I do not believe that Congress intended that each person who drives his automobile or truck across the bridge should have to apply for a permit or license and give a bond to pay for his small portion of extra compensation of customs employees.
Plaintiffs, apparently recognizing that such a construction of the statutes would, in effect, close the bridge to private traffic from five o’clock in the afternoon until eight o’clock in the morning, and largely destroy its usefulness, do not urge that this burden should be imposed upon such users. They urge rather that the owner of the bridge should be the one who should apply for the permit, give the bond, and pay for the extra compensation of the customs employees. This would be a less inconvenient solution of the problem, but the statutes do not seem to me to permit it. Section 401 (b) of the Tariff Act of 1930 defines a vehicle, for the purpose here in question, as follows:
The word “vehicle” includes every description of carriage or other contrivance used, or capable of being used, as a means of transportation on land, but does not include aircraft.
I do not think a bridge is a vehicle, within either the ordinary or this statutory definition of that word, any more than a road is a vehicle. Since the duty is imposed upon the *178 “master, owner, or agent, or Act of 1930, Sec. 451, 46 Stat. 708, 715), it does not fall upon the owner of the bridge, unless, as plaintiff urges, as an agent the customers of his bridge. In the case of the pedestrians, we need not inquire into the question of agency, since no vehicle is involved at all whose owner might be represented by an agent. In the case of the-private automobile or truck, I do not see how the collection of a bridge toll from its owner or driver constitutes the owner of the bridge the agent of the owner or driver with reference to customs, if any, collectible upon his load or baggage, if any. Plaintiff urges that the provisions of Section 453 of the Tariff Act of 1930 (46 Stat. 708,716), imposing a penalty for unlading without a special permit upon, inter alia, “every other person who knowingly is concerned, or who aids therein,” of the value of the merchandise or baggage, and, in some cases, of the forfeiture of the vessel or vehicle, make the owner of the bridge an agent of his customer for the purposes of obtaining a special license and giving bond. This section does not, by imposing a penalty upon one who comes within its definition, make such a person the agent of another for the purpose of applying for a license or giving a bond for him. Besides, one who permits another to walk across his toll bridge, or drive his automobile across it, is not “knowingly concerned” with the others unlading a vehicle without a license, when the other has no vehicle, or if he has one, it is no concern of the bridge owner whether he has or has not anything in it to unlade.
I would conclude from the foregoing that, with reference to what is probably the larger part of the traffic across the Ambassador- Bridge, the statutes here in question have no bearing upon it. If the customs authorities are willing to permit entry of such traffic into the United States at this point during any hour of the day, they may do so, .but the statutes, in my opinion, give them no power to impose special requirements upon such users of the bridge. And I have grave doubts as to whether they have the power to impose such requirements upon public busses and trucks, since the port is not kept open for their convenience and no extra expense is usually incurred in order to serve them. Certainly *179 tbe whole of the cost, outside the hours from 8 A. M. to 5 P. M., could not be imposed upon the few public conveyances that might enter during that time, when in fact the entry is kept open for public convenience to accommodate the much greater number of other persons to whom the statutes relating to special licenses and bonds and payment of extra compensation have, as I think, no application.
What I have said about the Ambassador Bridge is applicable also to the Detroit and Canada Tunnel. A tunnel is not a vehicle and the statute relating to extra compensation does no*, I think, apply to it.
If, by what I regard as a strained construction of the word “vehicle,” or the word “agent,” as used in the statutes, we hold that the Government may collect from the Bridge Company or the Tunnel Company, and therefore must pay its customs employees extra compensation, we have still found no solution for the numerous points of entry where the access to the border is over a free public road. Then there would be no person to whom, by any stretch of interpretation, the extra compensation could be shifted, hence extra compensation would not be payable.
In my opinion, the applicable statute is not one which should receive a strained construction in order to permit plaintiffs to recover. The public inconvenience of either closing these facilities except for a few hours in the daytime, or else imposing the whole expense of keeping them open upon only a few of those who are accommodated by their being kept open, would be great. As to keeping these facilities open at the public expense, without reimbursement from the users, and paying the employees who work their regular eight hour shift or a part of it, at some time between five P. M. and eight A. M. at the rate of three days pay for one eight hour day’s work, or three hours pay for one hour’s work, no one contends, I believe, that there is any warrant in the statutes for that. That scale of extra compensation is provided for only in statutes which provide for its reimbursement by the users of the service, and the legislative history shows that it was not intended to be paid when the Government could not recover it. Aside from this section, there is nothing in the statutes to indicate that customs employees are *180 regarded by Congress as being in a different class from other employees of the Government, such as postal employees, who must do their regular day’s work at such time of day as the work is needed. It is of interest to note that Congress has provided for extra pay of 10 percent of the regular hourly rate for certain postal employees for work done between six P. M. and six A. M.[1] It could hardly be supposed that Congress intended that for another class of employees the extra pay, payable out of the public treasury, and without reimbursement to the Government, should be 200 percent instead of 10 percent, for working during the less desirable hours.

 Act of May 24, 1928, C. 725, 45 Stat. 725, as amended May 12, 1939, C. 129. 53 Stat. 741, 39 U. S. C. 828.